KLIEBERT, Chief Judge.
The plaintiff in this matter, Juliet Watson Berry, has sued for damages for personal injuries she sustained when she fell while painting from a temporary scaffold attached to a building being constructed by and situated on land owned by the defendant civic association of which she was a member. Her husband joined seeking damages for loss of consortium. Joined as defendants in the original petition were the association and its alleged liability insurer, State Farm Mutual Insurance Company.
Amending petitions brought additional parties into the action with the resulting third party demands, cross-claims and motions for summary judgments. The additional parties have all been dismissed. It is conceded the proper parties remaining before the court were those who were before it originally, i.e., the plaintiffs, Estelle Civic Association, and its insurer, State Farm Mutual Insurance Company.
The case was heard by a jury and after four days of trial, was submitted to the jury on interrogatories, the first and second of which and the answers thereto were as follows:
“1. Was the scaffold in question defective and did it create an unreasonable risk of harm or injury to Juliet Berry? Yes_No x
2. Was the scaffold in question in the care, custody and control of the defendant, Estelle Civic Association?
Yes x No_
If your answer to both questions 1 and 2 are Yes, proceed to question 3. If your answer to either question 1 or 2 is No, stop, sign this form, and return to the courtroom.”
A judgment in conformity with the verdict was entered on March 22nd, 1991. After motion for new trial and judgment without the verdict being dismissed, the plaintiffs brought a timely appeal.
On appeal plaintiffs assign as issues: (1) whether the jury understood the concept of strict liability and found such according to the evidence, and (2) whether the trial court erred in refusing to allow counsel for plaintiffs to discuss strict liability and victim fault in summation to the jury.
For the reasons which follow, we affirm the judgment of the trial court dismissing the plaintiffs’ case.
With respect to the happening of the accident, the record contains the following testimony of Mr. Earl Tardiff, a member of the defendant association who had known plaintiff Juliet Berry for over thirty years and who admonished her not to use the scaffold. His testimony, in part, was as follows:
“Q. Alright. And did you explain that to Mrs. Berry?
A. I just told her I wouldn’t get up there. Because I got two discs out my back, and I wouldn’t want to see nobody fall. And I told her she was gonna fall and break her neck.
Q. You told her that?
A. Yes, sir.
Q. What did she say?
A. Well, she told me should could do anything. She said, I can do it. I said, well that’s up to you, but I wouldn’t get up there. And they had eight or ten other people up there, out there, sitting around, and some painting, and they said, Juliet don’t climb up there. She climbed up, and as she was proceeding to climb up the scaffold, Mr. Crochet was on the opposite side of the scaffolds with a ladder, and he was painting, and he said, wait, if you want to get up there that bad, I’ll bring you this aluminum ladder.
I said, oh man, she ain’t gonna get up there. Well, she done crawled up there, and she was on her fours, her knees and her hands, like this on the scaffold. I said, please don’t move Juliet, they got three cement blocks down there, I’m gonna move them cement blocks, because you’re gonna fall and break your back, and then I’d have to live with that myself, that I was too lazy to move the three cement blocks. And she went on across it.
*579 I don’t remember if it was three foot or so she painted, and I was rolling in the door of the building over away from her, I’d say about ten foot, eight foot, and all I heard was (The witness slapped his hands together) a piece of wood coming down. And the lady done hit the ground, and there was nothing nobody could do.
And if I could have caught her, I’d have caught her. But I mean, it was just that fast, you know.
Q. How long do you think she was up there before she fell Mr. Tardiff?
A. It wasn’t very long.
Q. A matter of minutes, a matter of hours?
A. Oh no, I’d say maybe four minutes, five minutes at the longest, from my recollection. Because she walked over from one side to the other side and started painting, coming up. I don’t remember. It looks like it was about three to four foot she had did on that fascia.
Q. You mentioned earlier that there was someone out there had an extension ladder that they were using to paint the other—
A. Mr. Berthelot’s son was suppose to catch the back gable where we— Mrs. Berry fell at, just like he caught the other gable.
Q. So he was supposed to have painted the area where she was painting?
A. Yeah.
Q. All right. And he was going to use the extension?
A. But she said no, she wanted to get this — all this painting done that day. That’s why we were having a painting party.”
Another member of the Association, Olden Crochet, gave this testimony:
“Q. Okay. And did you have any idea that Mrs. Berry was going to climb the scaffold to paint?
A. No.
Q. Did you see her when she did get up on — start to go up on the scaffold?
A. Yeah, I told her I didn’t approve of her getting on the scaffold. And she said that she’s used to it, she could do it, she could handle it. So I said, well if you want to do that, I’ll hold the ladder for you. And I held the ladder for her to get on the scaffold.
And then after she got up there, I told her to be very careful, not to move on that thing, unless she held with one hand holding, one hand at all times. I said, cause it can be tricky.
Q. How did you know that?
A. Oh man, I know these scaffolds all my life. My daddy used to be a contractor, and these nail scaffolds is put up automatically around a building when they put siding and everything up.
Q. When you said nail scaffolds, you mean scaffolds made out of—
A. That particular scaffold, yes.
Q. Makeshift.
A. With boards on the building coming out and to the ground, with cripples nailed in there to steady the boards, yeah.
Now, they’s safe, but you got to know how to walk on them.
Q. And it was for that reason that you warned her not to go up on the scaffold?
A. Well, it was my own opinion.
Q. I understand.
A. I don’t think it’s a woman’s place.
Q. And you felt it would be — it could possibly be unsafe?
A. Yes, I just — it just felt unsafe to me, that’s all.
Q. If you didn’t know what you were doing?
A. Right, right.”
Another witness, Rae Pardee, who had known Mrs. Berry for over thirty years, testified that she knew the latter to have had episodes of vertigo, the last of which had been within six to eight months of the accident. This witness, who was an eyewitness to the accident, indicated that Ju *580 liet Berry kicked or struck a brace that was supporting the board upon which she was standing, which in turn caused her to lose her balance and fall to the ground. The pertinent part of her testimony in this regard is as follows:
“Q. Okay. On this particular day, the day that she fell, did you actually see her fall?
A. Yes, I did.
Q. Could you describe to the jury exactly what you saw?
A. Well, she was up on the scaffold and I was catercorner, sitting under the tree in a chair, and we were talking. And—
Q. You said, we were talking. Who was talking?
A. She and I were talking, and a couple of the ladies who had been there prior, but whom had left, we were all sitting there talking. And she was painting, and the — she handed her paint can down to someone in the door, I don’t know who it was, and we were still talking. And when she came up, she turned. Now she went down this way into the door, and she came back up, and then we were talking and she was turning. And when she turned heading north, her foot — she was not turning towards the building, she was turning towards the outside facing me. Her right foot, which was in back, she was bringing it around towards the front, and it hit a support that was about maybe three feet down from the end. And her foot knocked out that support, and then the board began to do this, and she looked like she was on a diving board, you know, like that. She took then at that point, and came forward to the ground, it wasn’t like falling, it was coming forward. And her two feet hit the ground, and then her knees buckled under her, and she fell sort of in an angle like this with her hand over her head like she was going to try to grab the ground, you know, come down with her hands.”
Vol. 5, pp. 975-976.
Under cross-examination by plaintiffs’ counsel, Pardee further testified:
“Q. Mrs. Pardee, I want to find out if you can tell us please, which board you saw Mrs. Berry kick or strike?
A. At the end of the building there was a larger support holding the board, and then approximately three feet down from where the board was hooked onto the end of the building was another support. I don’t know whether it was attached to the scaffold board she was standing on, or whether there was a support running from the building underneath to this support, but that is the one she kicked.
Q. Was that a support board for the scaffold?
A. It was a support board.”
Vol. 5, p. 978.
On page 3 of the Berrys’ brief, it is suggested that “On cross-exam Mrs. Par-dee acknowledged that it was a touching rather than a kick of the board ...” by Juliet Berry. Pardee’s actual testimony under cross-examination reflects no so acknowledgment:
“Q. Mrs. Pardee, is it really fair to say then that Mrs. Berry just touched this board with her foot?
* * * * * *
A. When you say touch, I can touch like this and it doesn’t mean any thing. She hit it with force.”
Vol. 5, pp. 983-984 (colloquy regarding objections deleted).
While we cannot, of course, have any way of knowing whether the jury understood the concept of strict liability, as questioned by counsel for the appellant, we point out the testimony quoted above simply to show that the jury’s conclusion in finding that the scaffold in question was not defective and/or did not create an unreasonable risk of harm was a permissible view of the evidence and clearly one that cannot be said to be manifestly erroneous. *581 This being the case, the finding may not be set aside. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Coming now to the other ground urged for reversal, i.e., the trial judge’s alleged refusal to allow counsel for plaintiff to discuss strict liability, the record reflects that during the course of his summation, the following colloquy took place:
“I doubt seriously that you have heard the term strict liability at all. And if you had heard it, you probably wouldn’t understand what it meant. Strict liability means absolute liability. It means—
MR. HALL:
I object your Honor, that is an improper statement of the law.
MR. BUCK:
I join.
THE COURT:
Mr. Greenburg, don’t instruct the jury as to what the law is in this case.
MR. GREENBURG:
Well, if you Honor please, this is a strict liability claim, as your Honor knows very well.
THE COURT:
You can tell them — you can argue the facts, but not the law.
Vol. 5, pp. 1034-35.
Later in his summation, plaintiffs’ counsel again suggested:
“And if this thing did fall from beneath the scaffold board, if this support fell in that manner and caused the scaffold board to fall, then I think this gets into the area of what we call strict liability, or basically absolute liability.
MR. HALL:
I again object to that characterization, your Honor. That is not proper. It’s not even a proper statement of the law.
MR. BUCK:
Objection.
THE COURT:
The objection is sustained. Counsel don’t instruct the jury as to the definition of the legal terms involved in the case.”
Vol. 5, p. 1040.
The trial judge’s ruling was correct. This is not an absolute liability case but one based on strict liability as plaintiffs’ counsel himself contended throughout the trial. His requested jury charge No. 1 was a strict liability charge which was in fact delivered to the jury by the judge.
For the reasons assigned, we find no error in the verdict and judgment appealed from and the same are therefore affirmed. Costs are imposed on appellants.
AFFIRMED.